[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION DISPOSITION PHASE
Legal Status:
On November 20, 2001, Angelina Q. mother of Marianna (mother), entered a plea of Nolo Contendere to the allegation that the child had been allowed to live under conditions, circumstances or associations injurious to wellbeing. After determining that the plea had been entered knowingly, voluntarily and willingly, an adjudication of neglect was entered. The child had been removed under an Order of Temporary Custody signed by this Court on March 9, 2001. The issue of disposition was tried to the Court CT Page 16837 on December 7, 2001.
Finding of Facts:
Marianna, born March 2001, a medically fragile infant, was placed in a DCF licensed medically complex foster home upon her removal. Her diagnosis is as follows:
 L-transposition of the great arteries (SLL), mild pulmonary valve stenosis, mild left AV valve regurgitation, spontaneous closure of VSD, first-degree heartblock. Diagnosis of V. Ramish Iyer, M.D., State's exhibit B.
Mother gave birth to another child, Axia, on July 30, 1998 while living in New York City with her paternal grandaunt, Fe Figueroa (Fe). Mother found her way to New York by seeking aid from Fe in the form of an airline ticket from her native Puerto Rico, alleging domestic abuse and violence. Fe took her in and it was there that she gave birth to Axia on July 30, 1998. Shortly after this birth mother began to spend more and more time away from this home, including overnights, leaving to Fe the task of caring for Axia, a task she performed well. Unfortunately, mother elected to leave Fe's home permanently as she and Axia took up residence with one Jose Ramos, an alleged drug dealer in the Bronx. Shortly thereafter, Axia received a serious burn to her leg while being bathed by mother for which she was given no immediate medical treatment by mother or friend. This failure resulted in an infection requiring hospitalization and removal of Axia by the State of New York in April, 1999. On July 26, 1999, Axia was placed with Fe, a New York licensed foster parent, where she has remained to this day. For reasons which are not readily apparent, there is considerable ongoing antipathy between mother and Fe. While its root is in an allegation made either by mother and related by Teresa Q. (Teresa, see below, page 3) or made by Teresa alone against Fe causing the latter a great deal of distress, Fe testified believably that she could and would put it aside to encourage mother's involvement in Axia's life. The appropriate authority investigated the allegation and found it to be unsubstantiated. Mother, however, has greatly diminished her visitation with her daughter since Axia has been in Fe's care.
A Court ordered psychological evaluation of mother reveals a young woman "who has difficulty perceiving the world as others do. She has some slight cognitive limitations. However, her greater difficulty lies in her inability to differentiate reality from fantasy effectively." InesSchroeder, Psy. D., State's Exhibit E. This finding becomes significant in understanding why mother would not be able to put aside her anger and CT Page 16838 antipathy for Fe. Dr. Schroeder goes on to state:
 "Emotionally, [mother] is under a great deal of stress as she attempts to understand the issues regarding the removal of her children. Her perceptions regarding the events leading to the removal of each of her children is that she has never shown a lack of care for her children and that social services and her aunt Fe Figueroa have been at fault for her current situation. She perceives that the people who have taken her children are taking these actions in order to harm her. She perceives the actions of social services and those that are against the return of her children as spiteful. She may be unwilling and unable to accept the responsibility for her current situation." State's Exhibit E, page 13.
 "Personality measures indicated that Angelina is a person who displays a pattern of impaired cognitive functioning similar to those with severe mental illness. She has a tendency to overvalue her own self-worth and become pre-occupied with her own needs at the expense of others. She tends to externalize blame and responsibility for the events that negatively impact her life." State's Exhibit E, page 7.
Although mother is still romantically involved with Moises C. father of Marianna, her true support system currently depends almost exclusively on her second cousin, Teresa Q. (Teresa). Teresa has been more of a mother to Angelina over the years than a cousin. Currently, Teresa provides mother and Moises with all of their meals and as much guidance as she is able to summon. Because she holds herself out as a placement resource for Marianna, she participated in the above stated evaluation by Dr. Schroeder. She was found to be a "cognitively limited individual who tends to live her life simply." State's Exhibit E, page 12. Teresa has raised three children in addition to mother, whom she raised while both lived in Puerto Rico. She testified that she felt Angelina was a good mother. DCF expresses concern that if Teresa had custody of Marianna, the possibility that mother would be in a position to care for Marianna poses a substantial threat to Marianna's safety. Teresa denied that she would allow this to happen.
Dr. Schroeder noted the following about mother:
 "Angelina Q. reported that she feels that Marianna CT Page 16839 is healthy and that DCF fabricated the diagnosis of a heart condition. This would be a very serious hazard if Marianna were placed in Angelina's care. Angelina's perception is that this medical condition was created to limit Angelina's access to her child. Angelina reported that she would be able to care for the child adequately on her own if the child were returned to her. However, this is questionable due to Angelina's difficulty in appropriately analyzing situations and her cognitive distortions of reality. This issue becomes more problematic since Angelina would spend long periods of time on her own due to Mr. C. work schedule." State's Exhibit E, page 14.
DCF seeks to place Marianna with Fe Figueroa. Because of this, Fe also submitted to Dr. Schroeder's evaluation. "Ms. Figueroa does not present with any difficulties and seems capable of caring for the children in her care. She has experience raising several children and feels capable in caring for the needs of Marianna regardless of the health difficulties Marianna may have due to her heart and/or milk allergies. Ms. Figueroa is focused on her role as a mother and of providing support to her relatives." State's Exhibit F, page 6.
Issue of Placement:
Whoever cares for Marianna will need special training in recognizing adverse symptoms and immediate critical response techniques to handle what could easily degenerate into a life-threatening event. Testimony ofNurse Nadia Arcenas, DCF.
Although respondent mother argues that placement of Marianna with Fe Figueroa would be tantamount to a termination of her parental rights because of the ill will between the two, that argument does not bear scrutiny since mother has the ability to rectify the rift between the two but has chosen not to do so. DCF's argument that Teresa would turn over control of Marianna to mother, while unsubstantiated speculation, is a concern since mother is never far from Teresa. The entire burden of protecting Marianna would fall to Teresa, all day, every day. Dr. Schroeder's assessment is that mother will never be able to care adequately for Marianna. The Court is then left with the duty to choose which caretaker would better serve the best interest and safety of Marianna. Fe has a proven track record in caring for Axia and presents no reason why she would not be able to do the same for Marianna after receiving the appropriate training for a medically fragile child. Teresa is bonded with mother but asserts she would protect Marianna from being left alone with mother. While Teresa is not the stronger candidate perCT Page 16840se, she would provide mother the opportunity to be near her child most of the time.
Teresa's accuracy as a reporter at times gives this Court pause. Her explanation to Dr. Schroeder of the events surrounding the removal of Axia by the State of New York was sparse at best, and when questioned further, she tried to give the information the brightest possible interpretation.
 "She [Teresa] stated that the child was removed due to the injury Axia had during a bath. When pressed if this was the only reason for the removal, Teresa stated that she thought that it was also due to Angelina's homelessness and relationship with a man who was abusive and suing drugs. . . . Teresa commented that she witnessed Angelina caring for Axia during the first month of life. She noted that Angelina was able to feed, bath, dress and care for Axia very well without the assistance of any other people. She stated that she understands that professionals may see Angelina's abilities differently but that in her view, Angelina was a good mother." State's exhibit E, page 9.
In deciding what is in the best interest of the child, the Court must look primarily toward the issue of safety. This is true in every case, but the concept must be exaggerated when applied to the case of a medically fragile infant. This infant is at a risk far higher than the average child of finding herself in a life-threatening situation. Her caregiver needs special training to recognize the multiple symptoms and the immediately needed treatment should some of those symptoms present. While they are recognizable by a layperson, such as shortness of breath, trouble eating, constant cough, fainting, cyanosis, squatting stance, infection, or the significance of a common cold for this child, that layperson must be on heightened alert at all times. Pediatric CPR, first aid and developmental exercises are mandatory skills for such a caregiver. Having observed and listened to both Teresa and Fe on the stand as they testified about the various aspects of this case, this Court is not convinced that Teresa is capable of such high-functioning protection of Marianna. At the same time, the Court is convinced that Fe, after receiving all the appropriate training, is capable of this task and that Fe has a genuine desire to do this, motivated by the needs of this child alone. That said, the Court is convinced that Teresa would not do anything purposely to endanger Marianna. Her skill, however, in avoiding that appears much less than Fe's. As Dr. Schroeder said, she lives life simply. As noted above in reference to her explanation of Axia's injury, CT Page 16841 she is not quickly forthcoming with the totality of details. "In regards to Marianna's removal, Teresa reported that she did not understand why DCF intervened." State's Exhibit E, page 9. This is not a situation where one can be less that forthcoming with DCF or medical providers. Marianna's very survival might depend upon swift action, and reticence with DCF or a medical provider, merely out of fear of losing custody of the child, might very well translate into disaster. The fragility of this child is not fully appreciated by Teresa.
The Court finds that Marianna's safety and best interest will be better served by vesting custody in the Commissioner of Children and Families for placement via Interstate Compact with Fe Figueroa.
MACK, J